IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

DIANA L. BRETT,

                Plaintiff,                          09-CV-6253-ST

        v.                               OPINION AND ORDER

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                Defendant.

STEWART, Magistrate Judge:

**<u>INTRODUCTION</u>**

      Plaintiff, Diana L. Brett ("Brett"), seeks judicial review of the final decision by the Social

Security Commissioner ("Commissioner") denying her applications for Supplemental Security

Income ("SSI") under Title XVI and Disability Insurance Benefits ("DIB") under Title II of the

Social Security Act ("SSA"), 42 USC §§ 401-33.  This court has jurisdiction to review the

Commissioner's decision pursuant to 42 USC § 405(g) and § 1383(c)(3).

1 - OPINION AND ORDER

All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).  For the reasons set forth below, the Commissioner's decision is affirmed.

## ADMINISTRATIVE HISTORY

Brett protectively filed for DIB and SSI on August 2, 2006, alleging a disability onset date of December 23, 2005.  Tr. 69-76.[1]  Those applications were denied both initially (Tr. 26-27) and on reconsideration (Tr. 23-24).  Brett requested a hearing before an Administrative Law Judge ("ALJ").  Tr. 22.  On August 18, 2008, ALJ Lloyd E. Hartford presided over a hearing at which Brett appeared and testified.  Tr. 28-66.  He issued a decision on September 26, 2008, finding Brett not disabled at any time through the date of the decision.  Tr. 9-16.

On June 5, 2009, the Appeals Council denied Brett's request for review making ALJ Hartford's decision the Commissioner's final decision.  Tr. 3-5.

## BACKGROUND

Brett was born in 1959 and was 48 years old at the time of the August 18, 2008 hearing.  Tr. 69.  She completed high school and earned a certificate as a certified medical assistant in 1977.  Tr. 96-97.  She has past relevant work as a taxi driver, home attendant, cook, jewelry salesperson, and telephone solicitor.  Tr. 58-59, 93, 145, 264.  She alleges that she became unable to work on December 23, 2005, at age 46, due to diabetic neuropathy, fibromyalgia, depression, asthma, chronic back pain, high blood pressure and cholesterol, and restless leg syndrome.  Tr. 87, 92.

///

---

[1] Citations are to the page(s) indicated in the official transcript of record filed on February 17, 2010 (docket #13).

## DISABILITY ANALYSIS

In construing an initial disability determination, the Commissioner engages in a sequential process encompassing between one and five steps.  20 CFR §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 US 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled.  20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement.  20 CFR §§ 404.1520(a)(4)(ii), 416.909, 416.920(a)(4)(ii).  Absent a severe impairment, the claimant is not disabled.  *Yuckert*, 482 US at 141.

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.  20 CFR §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments.  20 CFR §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

///

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work.  20 CFR § 416.920(a)(4)(iv).  If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy.  *Yuckert*, 482 US at 142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F3d at 1098.  If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC.  *Id.*  If the Commissioner meets this burden, then the claimant is not disabled.  20 CFR §§ 404.1566, 416.966.

## ALJ'S FINDINGS

At step one, the ALJ concluded that Brett has not engaged in any substantial gainful activity since the alleged onset date of her disability.  Tr. 11.

At step two, the ALJ determined that Brett suffers from the severe impairments of morbid obesity, type II diabetes mellitus with peripheral neuropathy in the feet, and fibromyalgia.  *Id.*  The ALJ also noted Brett's asthma and reports of depression, but found the asthma to be non-severe and found no medically determinable mental impairment consistent with the record as a whole.  Tr. 11-12.

At step three, the ALJ concluded that Brett does not have an impairment or combination of impairments that meets or equals any of the listed impairments.  Tr. 13.  The ALJ found that Brett has the RFC to perform sedentary work, including the capacity to lift and carry 10 pounds occasionally and less than 10 pounds frequently, stand or walk with normal breaks at least two hours in an eight-hour workday, sit with normal breaks about six hours in an eight-hour

workday, and has an unlimited ability to push and pull within the noted lift and carry restrictions.
*Id.*

At step four, the ALJ found that Brett is unable to perform any of her past relevant work.
Tr. 17. However, he concluded that Brett is able to perform other unskilled sedentary work that
exists in significant numbers in the national economy as a lock assembler or hand packager, such
as a packaging line worker or hand bander. Tr. 18. Accordingly, the ALJ concluded that Brett
was not disabled at any time through the date of the decision. Tr. 19.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner
applied proper legal standards and the findings are supported by substantial evidence in the
record. 42 USC § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir
2004). This court must weigh the evidence that supports and detracts from the ALJ's
conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*,
157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of
the Commissioner. *Id*, citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see
also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001). Variable interpretations of the
evidence are insignificant if the Commissioner's interpretation is a rational reading.
*Lingenfelter*, 504 F3d at 1035; *Batson*, 359 F3d at 1193.

///

///

///

## DISCUSSION

Brett asserts that the Commissioner's decision should be reversed and remanded. In particular, Brett asserts that the ALJ erred by finding her testimony not credible and rejecting the opinion of her treating physician. As a result, Brett contends that the ALJ improperly assessed the severity of her restrictions and her RFC and failed to include all of her restrictions in the step five analysis. Brett also asserts that the Commissioner's decision is irreconcilable with a later decision finding her disabled as of September 29, 2009. For the reasons that follow, this court concludes that the Commissioner's decision is supported by substantial evidence and free of legal error which would warrant reversal or remand. Accordingly, the Commissioner's decision is affirmed.

## I. **Medical Treatment and Testimony Regarding Pain and Other Symptoms**

### A. **Pre-Filing Treatment Records**

Brett's medical history includes large gaps in treatment due to her inability to afford appointments and medications. However, the record contains treatment records spanning several years from two different providers.

From March 2001 through early 2003 and again in mid-2004, Brett was seen at the Family Care Medical Clinic in Portland, Oregon. At her initial evaluation on March 21, 2001, Brett reported a 15-year history of diabetes, well controlled gastroesophageal reflux disease ("GERD"), fatigue, depression, vision changes, tingling and numbness in her toes and tips of fingers, and pain in her knees, hands, and back. Tr. 177-80. The knee pain was "severe esp[ecially] when weight bearing for long periods of time." Tr. 177. Brett was morbidly obese, 69.5 inches tall and weighing 321 pounds. *Id*. Later appointments in April, June, and July 2001 reflect similar reports of symptoms, with treatment focusing on her ongoing back and knee pain.

Tr. 173-76.  By mid-June 2001, Brett weighed 332 pounds and was experiencing days-long bouts

with back pain.  Tr. 175.  Her providers encouraged exercise with a goal of weight loss to reduce

back and knee pain and gave her samples of pain medicines for breakthrough pain.  Tr. 175-76.

Brett underwent an MRI in July 2001 and by December 2001 had decreased her weight to 308

pounds.  Tr. 171, 173.  Brett continued to experience back and knee pain in early 2003.  Tr. 167-

68.  However, her treatment records stop for a year due to a change in insurance an her inability

to find a doctor.  Tr. 165.  In September 2003, Brett began working as an in-home caregiver.

Tr. 82, 93.

On April 5 and 12, 2004, Brett was again seen at the Family Care Medical Clinic.

Tr. 156-58, 164-66.  Both her diabetes and GERD were uncontrolled, and she was reporting

disorientation, confusion, memory loss, possibly related to her diabetes.  Tr. 166.  At that time,

she had taken no medications for nearly one year.  Tr. 164.  Her doctor prescribed medications

and other aids for diabetes, asthma, GERD, high cholesterol, and back and knee pain.  Tr. 158.

At subsequent appointments on May 3 and 24, 2004, Brett reported continuing to experience

pain in her toes and lateral portions of her feet, which Brett's doctor thought was "possibly

related to early diabetic neuropathy."  Tr. 153.  The final entries in this series of records consists

of telephone messages regarding coughs and refills of Brett's prescriptions in July 2004.  Tr.

146, 149-50.

About a year later, Brett began treating with family practitioner, Bhavesh Rajani, M.D.

Tr. 244-45.  She was continuing to work as a caregiver and reported no diabetic care for two

years.  Tr. 244.  Dr. Rajani prescribed Elavil for Brett's peripheral neuropathy and chronic back

pain, restarted her on diabetes medications, and advised her to stop smoking and monitor her

blood sugar.  Tr. 245.  On August 11, 2005, Brett continued to report problems with peripheral

edema and neuropathy.  Tr. 236.  Dr. Rajani advised her to continue with her medications and

await progress.  Tr. 237.  A month later, on September 9, 2005, Brett reported crying all the time

and feeling depressed and continued to report foot pain.  Tr. 227.  Dr. Rajani performed a

thorough physical and adjusted Brett's medications, including increasing the dosage of Elavil to

help with Brett's foot pain as well as with the low mood and depression.  *Id*.

On October 10, 2005, Brett reported a two-day history of left knee pain.  Tr. 222.  X-rays

revealed mild osteoarthritic changes but no evidence of fractures or acute bony abnormalities.

Tr. 224-25.  Dr. Rajani started Brett on Prednisone and continued her other medications.  Tr.

223.  Two months later, and one week before her alleged onset date, Brett reported to Dr. Rajani

that she was having a "hard time holding things" due to pain in her hands and that her feet were

"jumpy" at night.  Tr. 210-11.  Dr. Rajani continued Brett's medications, again increasing the

dosage of Elavil, this time to address Brett's "restless legs."  Tr. 212.

In December 2005, Brett had been working for over a year as an in-home caregiver.  Her

job required her to lift a client who weighed about 100 pounds from and to her bed, place her in

and out of a wheelchair, and shower her.  Tr. 39-40.  After Brett dropped the client on the bed,

she quit her job.  *Id*.  On December 22, 2005, which appears to be the day she quit working, Brett

reported to Dr. Rajani that she was aching "all over," "d[id] not think she [could] do her work

anymore," thought she may have fibromyalgia, wanted to "think about going onto disability,"

and wanted to see a rheumatologist.  Tr. 207-08.  She reported feeling "much better at

weekends" and "does not think she can do her work anymore."  Tr. 208.  She felt she "may end

up dropping clients" and asked for a note to stay off work until she could see a rheumatologist.

Tr. 209.  Dr. Rajani reportedly told Brett not to lift anything weighing more than 10 pounds.  Tr. 50.

On January 10, 2006, James Smith, M.D., a rheumatologist, examined Brett.  At that time, Brett did not plan to return to her work as a caregiver which required frequent lifting and reported suffering "all over" pain since 2000.  Tr. 192.  Dr. Smith found "[f]ibromyalgia tender points were tender at all locations" and diagnosed fibromyalgia syndrome and "[m]ultiple medical problems."  *Id.*  He also provided Brett with an Attending Physician's Statement indicating that she was "still disabled" and that he was "unable to determine a return to work date."  Tr. 194.  Following this diagnosis, Brett did not see Dr. Smith again and received no treatment for her fibromyalgia through the date of the hearing in August 2008.  Tr. 37.

Brett again saw Dr. Rajani on March 7, 2006.  Tr. 199-201.  To help her aches and spasms, he increased the Elavil dosage.  Tr. 199-200.  Brett reported having "fatigue issues," but the chart notes give little detail about her activities of daily living and otherwise are inaccurate by stating that Brett is "a care giver – lifts at work" when she had not been working for two and a half months.  Tr. 199.  The final two chart notes concerning treatment with Dr. Rajani are on March 31, 2006, for sinusitis (Tr. 197-98) and May 15, 2006 for coughing and not sleeping well (Tr. 195-96).  Brett filed her claims for DIB and SSI benefits a couple of months later on August 2, 2006.

**B.  Post-Filing Medical Records**

On November 22, 2006, Mark J. Michaud, M.D., conducted a disability determination physical examination.  Tr. 246-48.  At that time, Brett reported "nearly constant pain, especially in her legs," and an inability to sit or stand for more than about 15 minutes before needing to

change position.  Tr. 246.  She had "occasional ankle swelling and cramping in the legs but no significant swelling in the legs," as well as "significant musculoskeletal symptoms with general muscle aches, joint pain including neck pain, hip pain, knee pain, foot pain, shoulder pain, elbow, wrist and hand pain."  Tr. 247.  She had "decreased sensation in the feet and slightly in the hands," but normal strength in all four extremities.  *Id*.  She also reported "some difficulty manipulating smaller objects," but Dr. Michaud found that "difficult to assess . . . in the office setting."  Tr. 248.  She also reported a lack of medical treatment and medications due to insurance issues over the past year.  Tr. 246.  Dr. Michaud opined that Brett "has significant physical problems, which would warrant a disability determination."  Tr. 248.

After reviewing the medical records, Leslie E. Arnold, M.D., completed a Physical Residual Functional Capacity Assessment on December 4, 2006.  Tr. 263-70.  Dr. Arnold found no established postural, manipulative, communicative, or environmental limitations and concluded that Brett "has the capacity for RFC of sedentary with no limits in handling or fingering."  Tr. 269.  Dr. Arnold's RFC assessment was affirmed by Ward E. Dickey, M.D., on March 2, 2007.  Tr. 272.

Also on December 4, 2006, Maximo J. Callao, Ph.D., completed a Psychiatric Review Technique Form ("PRTF").  Tr. 249-62.  Dr. Callao found no medically determinable mental impairment, concluding that although Brett "may feel depressed at times, the evidence does not show that this limits her significantly in her ability to do work-related mental activities."  Tr. 261.  Dr. Callao's PRTF was affirmed by Dave Sanford, Ph.D., on March 2, 2007.  Tr. 271.

**C.  Brett's Testimony**

On August 18, 2008, Brett testified that she has pain all over, all the time.  Tr. 34.  The pain can be caused by standing too much, sitting too long, or other every day activities.  *Id*. About four years prior to the hearing, Brett was taking Percocet for the pain caused by the neuropathy in her feet and back pain caused by a decades-old injury.  Tr. 35-36.  However, she no longer took pain medications because she could not afford them and did not like the way they make her feel.  *Id*.  Instead, she relied on changing position to provide some relief from the pain. Tr. 35.

Brett testified that she needs to be able to regularly alternate positions and be able to sit, stand, and lie down at will.  Tr. 42.  In a normal work chair she can sit for 45 minutes, then needs to walk around for a half hour before being able to sit for another 45 minutes.  Tr. 43.  Brett walks for exercise and can manage about two blocks at a time.  Tr. 44.  She can stand for about a half hour.  Tr. 44.  After either walking for two blocks or standing for about a half hour, her back bothers her, her feet go numb and she begins to trip.  Tr. 44-45.

In order to lessen the swelling and pain in her feet, Brett lays down and props her feet up about four or five times per day for about a half an hour.  Tr. 45, 57.  She sometimes soaks her feet in ice water to relieve the swelling.  Tr. 57.  Brett began getting numbness in her hands approximately a year before the hearing.  Tr. 46.

## II.  Rejection of Treating Doctor's Opinion

### A.  Legal Standard

The weight given to the opinion of a physician depends on whether it is from a treating physician, an examining physician, or a nonexamining physician.  More weight is given to the opinion of a treating physician who has a greater opportunity to know and observe the patient as

an individual.  *Orn v. Astrue*, 495 F3d 625, 632 (9th Cir 2007).  If a treating or examining

physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear

and convincing reasons.  *Id*; *Widmark v. Barnhart*, 454 F3d 1063, 1067 (9th Cir 2006).  Even if

the opinion is contradicted by another physician, the ALJ may not reject it without providing

specific and legitimate reasons supported by substantial evidence in the record.  *Orn*, 495 F3d at

632; *Widmark*, 454 F3d at 1066; *see also Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F3d 595,

600 (9th Cir 1999) ("When a nontreating physician's opinion contradicts that of the treating

physician – but is not based on independent clinical findings, or rests on clinical findings also

considered by the treating physician – the opinion of the treating physician may be rejected only

if the ALJ gives specific legitimate reasons for doing so that are based on substantial evidence in

the record.") (internal quotations and citations omitted).

     The opinion of a nonexamining physician, by itself, is insufficient to constitute

substantial evidence to reject the opinion of a treating or examining physician.  *Widmark*, 454

F3d at 1066 n2.  However, it may serve as substantial evidence when it is supported by and

consistent with other evidence in the record.  *Morgan*, 169 F3d at 600.

### B.  Off-Work Notes

     The ALJ gave "moderate weight" to the opinions of Drs. Smith and Rajani "to the extent

that they were "obviously referring only to [Brett's] past work as a caregiver" and instead gave

"significant weight" to the opinion of Dr. Arnold, a reviewing doctor who completed the

Physical RFC Assessment that Brett could perform sedentary work.  Tr. 16.  Brett contends that

this constituted error.

The difficulty with this argument is that the record contains no opinion by either Dr. Rajani or Dr. Smith that Brett is completely incapable of working.  Instead, in December 2005, Dr. Rajani apparently gave Brett an off-work note for her current job as an in-home caregiver.  Tr. 205.  A few weeks later in January 2006, Dr. Smith gave Brett a note stating that she was "still disabled" and that he was "unable to determine a return to work date."  Tr. 194. As the ALJ noted, Brett's "medical sources provided an [*sic*] off work statements in regards to the heavy lifting as a caregiver because of fibromyalgia at the time of the alleged onset date but never limited her from all work."  Tr. 14.  Brett testified that her job as an in-home caregiver sometimes required her to lift clients weighing more than 100 pounds.  There is no inconsistency between a note taking Brett off work from that job and Dr. Arnold's finding in the Physical RFC Assessment that she is capable of sedentary work.  Thus, the ALJ did not err by favoring Dr. Arnold's opinion over the off-work notes of Drs. Rajani and Smith.

## III.  Rejection of Specific Limitations

Brett also argues that the Commissioner improperly failed to incorporate into her RFC: (1) limitations caused by her mental impairment (depression); (2) manipulative limitations caused by hand pain; and (3) her need to change position at will and elevate her feet to reduce swelling.  A review of the record reveals that the Commissioner did not err in rejecting these limitations, declining to incorporate them into Brett's RFC, or determining that Brett is not disabled at step five.

### A.  Depression

Brett contends that the Commissioner erred by not including a mental impairment in her RFC. However, the record fully supports the Commissioner's conclusion that the medical evidence does not establish a medically determinable mental impairment.

A medically determinable impairment must be established through signs, symptoms, and medically acceptable clinical or laboratory findings, but under no circumstances can it be established through symptoms, namely the individual's own perception of the impact of the impairment, alone. *Ukolov v. Barnhart*, 420 F3d 1002, 1005 (9th Cir 2005). In addition to subjective symptoms, there must be objective medical evidence such as anatomical, physiological, or psychological abnormalities that can be observed apart from the plaintiff's statements of symptoms and that are shown by medically acceptable clinical and laboratory diagnostic techniques. 20 CFR §§ 404.1528(b)-(c), 416.928(b)-(c).

The record includes only sporadic references to depression. Tr. 180 (3/23/2001), 227 (9/9/2005), 208 (12/22/2005). Dr. Rajani thought Elavil would help Brett's "low mood," but prescribed that medication primarily to provide relief for Brett's peripheral neuropathy, chronic back pain and foot pain. Tr. 227, 245. Nothing in the record reflects ongoing mental health treatment or medications and nothing supports a significant increase in depression or other mental symptoms between the first record of depression in the record in 2001 and when Brett ceased working in December 2005. During much of that time, Brett was gainfully employed. At the hearing, Brett did not mention any limitations caused by depression or any other mental disorder. In sum, the record fully supports the Commissioner's agreement with the state agency psychological consultants that Brett had no medically determinable mental impairment during any relevant 12 consecutive months up to and including the date of the ALJ's decision.

### B.  Physical Limitations

The ALJ found Brett's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with [her RFC]." Tr. 14.  In particular, the ALJ rejected Brett's allegations that "she needs to lie down 4 to 5 times per day for 30 minutes at a time to prop up her feet, cannot use her hands and cannot sit and stand during the day," stating that those limitations were not "substantiated by the record as a whole."  *Id*.

To properly discount a claimant's symptom testimony, an ALJ is required to make "a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."  *Thomas v. Barnhart*, 278 F3d 947, 958 (9th Cir 2002), citing *Bunnell v. Sullivan*, 947 F2d 341, 345-46 (9th Cir 1991) (*en banc*).  A claimant must produce "objective medical evidence of an underlying impairment" or impairments that could reasonably be expected to produce some degree of symptom.  *Smolen v. Chater*, 80 F3d 1273, 1281-82 (9th Cir 1996).  If the claimant does so and there is no affirmative evidence of malingering, "the ALJ may reject the claimant's testimony regarding the severity of her symptoms only if he makes specific findings stating clear and convincing reasons for doing so."  *Id* at 1284, citing *Dodrill v. Shalala*, 12 F3d 915, 918 (9th Cir 1993).  In weighing a claimant's credibility, the ALJ may consider many factors, including "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities."  *Id* at 1284; *Orn*, 495 F3d at 637-39.

The ALJ also considers "the claimant's work record and observations of treating and examining physicians and other third parties regarding, among other matters, the nature, onset, duration, and frequency of the claimant's symptom; precipitating and aggravating factors; functional restrictions caused by the symptoms; and the claimant's daily activities." *Smolen*, 80 F3d at 1284 (citation omitted).

Here the record reveals no evidence of malingering. For purposes of this inquiry, this court will assume that Brett's longstanding diabetes and fibromyalgia diagnoses provide sufficient objective medical evidence of underlying impairments which might produce hand numbness and pain and a need to regularly change position. Nevertheless, the record reveals that the ALJ provided clear and convincing reasons for refusing to incorporate these restrictions into Brett's RFC based on Brett's lack of credibility.

With few exceptions, these limitations are supported exclusively by Brett's testimony or written reports of Brett and her partner. In September 2006, both Brett and her partner, Serena Brett, completed Function Reports describing Brett's impairments and the limitations they impose. Tr. 107-14, 116-24. With respect to her need to change positions, Brett stated, without elaboration, "I have to sit down, stand and lay [sic] down when I have to." Tr. 107. Her partner also noted that Brett has to sit when performing certain tasks such as cooking and folding laundry. Tr. 118. At the hearing, Brett testified that she had no idea how long in an eight hour workday she would be able to sit, stand, and walk, and noted that she would "have to lay down there sometimes too." Tr. 45. She stated that she lays down and elevates her feet four to five times per day for about a half an hour at a time. *Id*.

The ALJ refused to incorporate a restriction that Brett needed to recline four or five times per day with her feet elevated, noting that "no treating or examining physician instructed her of any medical basis for excessive inactivity or excessive rest or need to prop up her feet." Tr. 14. Instead, "[a]t the most, [Brett's] medical sources provided an [*sic*] off work statements in regards to the heavy lifting as a caregiver because of the fibromyalgia at the time of the alleged onset date but never limited her from all work." *Id.* As discussed above, it is entirely accurate that neither Dr. Rajani nor Dr. Smith opined that Brett is disabled from all work, and instead took her off work as a caregiver which required frequent heavy lifting. No medical chart notes reflect a need for Brett to lie down multiple times per day, and the only entry in the chart notes concerning elevating extremities is dated March 23, 2001, nearly five years before the alleged onset date, which states simply that the swelling in Brett's feet was reduced with "elevation." Tr. 180. Furthermore, no medical note reflects any report by Brett that she must lay down periodically during the day with her feet elevated.

In addition to a lack of medical chart notes to substantiate this restriction, the ALJ also discredited Brett's testimony based on the inconsistency between her testimony at the hearing that her "systems shut down" in May 2008 because she had not taken her medications (Tr. 41, 48-50) and the medical records regarding that hospital admission which merely indicated that Brett was suffering from a "viral syndrome" (Tr. 293). Tr. 14-15. Brett was seen in a hospital emergency department on May 20, 2008, reporting abdominal pain, vomiting, and diarrhea. Tr. 288-94. She testified that the hospital emergency room medical provider explained to her that her "systems shut down" as a result of her not taking her diabetes medications. Tr. 41, 48-49. However, the hospital records do not reflect that diagnosis. Over two weeks later on

June 13, 2008, Dick Ernest, Family Nurse Practitioner, did note that Brett suffered from uncontrolled diabetes, but does not state that this caused her hospitalization. Tr. 277-81. The tests taken at the hospital indicated elevated liver enzymes, but nothing indicates a complete "system failure" consisting of "everything . . . shutting down" as described by Brett at the hearing. Tr. 41, 280-87. Inconsistent statements or statements exaggerating symptoms may properly be used to discredit a claimant's testimony. *Tonapetyan v. Halter*, 242 F3d 1144, 1148 (9th Cir 2001).

Finally,[2] the ALJ found that Brett's activities of daily living were inconsistent with her assertion that she is unable to perform sedentary activity. The ALJ noted that Brett "can do household chores at her own pace, operate a vehicle and take short trips, walk 2 blocks, stand 30 minutes at a time, lift 15 to 20 pounds, but not repetitively, watch TV and sew," which he concluded "are not extensive but show that she does have the ability to perform sedentary activity." Tr. 15. Although these statements do not necessarily contradict Brett's testimony that she needs to lie down throughout the day, they do contradict her testimony that she is unable to work at all due to constant pain.

///

As with the alleged need to lie down and elevate her legs, the medical chart notes contain scant information regarding any hand symptoms or limitations. The first entries indicating hand problems are on December 15, 2005, when Brett reported pain in her hands and "a hard time

---

[2] The ALJ also noted Brett's failure to seek treatment or take medications. Tr. 14. As the Commissioner, concedes, it is inappropriate to discredit a claimant based on failing to receive medical care when the claimant could not afford the treatment. *Orn*, 495 F3d at 638. However, this error was harmless in light of the other clear and convincing reasons given by the ALJ to support his credibility determination.

holding things" to Dr. Rajani just before she quit her job as a caregiver.  Tr. 210.  Brett also

reported hand pain to Dr. Smith in January 2006 (Tr. 192) and to Dr. Michaud in November

2006 (Tr. 247).  Brett also testified that in about August 2007, her diabetes began causing

numbness in her hands.  Tr. 46.  When asked whether it causes "any limitations in [her] ability to

grasp objects and to handle objects," she responded, "No, just the numbness, I couldn't hold

things for very long."  *Id*.  She did not elaborate how often this occurs or how long she can hold

things.  Brett also stated that she needs someone to accompany her when she goes places "to

carry stuff and drive [her]" (Tr. 111).  Brett stated that she does laundry, dishes, and "some

cleaning," but that her partner puts folded clothes and dishes away.  Tr. 109.  Her partner stated

that Brett "can't really use her hands, stuff falls out of them" (Tr. 123), including hairbrushes

(Tr. 117) and change (Tr. 119; *see also* Tr. 111 ("I drop [money]").

Despite the reports by Brett to her medical providers of hand pain and difficulty with

manipulation, no medical provider did any testing or otherwise opined as to any manipulative

restrictions in the use of her hands due to pain or numbness.  To the contrary, although he found

slightly decreased sensation in the hands, Dr. Michaud found normal strength in all four

extremities, which presumably includes the hands.  Tr. 247.  The record also reveals that Brett

worked even when having difficulty with her hands.  The ALJ correctly noted that Brett has "no

evidence of motor loss, weakness, or atrophy" and has "normal range of motion and strength in

all extremities."  Tr. 13.  He also correctly noted Brett's own reported activities, such as sewing

and cooking, require use of her hands and that no medical sources observed "actual difficulties in

the claimant's ability to use her hands due to neuropathy on examination."  Tr. 15.

A review of the entire record reveals that the physical limitations Brett advocates (a need to repeatedly change positions, including lying down and elevating her feet, and a manipulative restriction) lack support in the medical records.  While Brett's diagnoses of fibromyalgia and/or neuropathy caused by diabetes might allow for such restrictions, the medical chart notes are virtually silent on the need for any such restrictions, leaving only Brett's brief testimony about her need to lie down and elevate her feet and numbness in her hands.  Medical findings about Brett's extremities directly contradict the claimed restriction of manipulative limitations, and Brett's activities of daily living may reasonably be viewed as inconsistent with the remaining restrictions.

If the Commissioner's "credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing."  *Thomas*, 278 F3d at 959, citing *Morgan*, 169 F3d at 600.  Based on a thorough review of the record, this court concludes that the Commissioner's decision is consistent with the record as a whole, supported by substantial evidence, and free of legal error.

///

///

///

///

///

///

**IV.  <u>Subsequent Finding of Disability</u>**

Finally, Brett contends that this case must be remanded in order to resolve a conflict created by a subsequent finding that she is disabled.  On March 8, 2010, the Commissioner issued a Notice of Award to Brett, finding her disabled as of September 29, 2009, and awarding disability benefits beginning March 2010 (docket #14-1).  Brett contends that this document reveals a conflict while the Commissioner requests that it be stricken as outside the closed administrative record.

As noted by the Commissioner, the period under consideration post-dates the period currently under review, namely the time period between Brett's alleged onset date of December 23, 2005, and the date of the ALJ's September 26, 2008 decision.  The record does not disclose what prompted the Commissioner to issue the subsequent finding of disability, but it apparently was based on Brett reaching age 50 and becoming presumptively disabled under the Medical-Vocational Guidelines.  In any event, the time period under consideration by this court precedes the date of the ALJ's decision.  Subsequent findings of disability concerning a later period are not relevant and create no conflict.  Accordingly, this court finds that the subsequent award provides no basis on which to remand based on an alleged conflict.

## **ORDER**

For the reasons stated above, the Commissioner's decision is AFFIRMED.

DATED this 30th day of August, 2010.

s/ Janice M. Stewart____
Janice M. Stewart
United States Magistrate Judge

21 - OPINION AND ORDER